[No. S063446. May 17, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ISABEL MORANTE, Defendant and Appellant.

**COUNSEL**

Kopeny & Powell, John W. Powell and William J. Kopeny for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson, James William Bilderback II, Susan D. Martynec, David L. Polsky and Kent J. Bullard, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—In this case we decide whether California courts have jurisdiction over the criminal prosecution of a defendant for conspiracy to commit an offense where the defendant, within the State of California, both entered into an agreement to commit the offense and committed acts in furtherance of the conspiracy, but the offense that is the object of the conspiracy was committed in another jurisdiction. We also decide whether California courts have jurisdiction over the criminal prosecution of a defendant for committing an offense based upon a theory of aiding and abetting the commission of that offense, where the defendant has committed acts in California that aided and abetted the commission of the offense, but the offense was committed in another jurisdiction. We conclude that our courts do have jurisdiction to criminally prosecute a defendant both for in-state conspiracies to commit offenses out of state, and for in-state aiding and abetting of the commission of offenses out of state.

I

The prosecution's case was presented primarily through the testimony of an investigating officer as well as through the testimony of a participant in the commission of the offenses. In 1990, City of Newport Beach Police Officer McKnight was assigned to the Orange County Regional Narcotics Suppression Program, a task force comprised of 60 investigators from local police departments, the federal Drug Enforcement Administration (DEA), the Federal Bureau of Investigation, and the United States Customs Service. The purpose of the task force was to investigate drug trafficking operations of various Colombian cartels in the United States.

The task force obtained authorization from the Los Angeles Superior Court to place a wiretap on the telephone line of Robinson Suarez (also known as Rob and Tony Vasquez), a Colombian national, 28 years of age, residing in Los Angeles, and known to be a high-level member of a drug trafficking operation. Within the operation, Mr. Suarez had the task of supervising the importation of cocaine into the United States, collecting the proceeds from sales of the cocaine, and transferring those moneys out of the United States.

On December 27, 1993, the task force arrested Margarita Molina, a courier for the drug trafficking operation who was responsible for collecting proceeds from the sale of drugs and transporting the moneys as directed by her superiors. The task force recovered $675,000 in cash from her vehicle, $9,000 in cash from her residence, and a number of pay-owe ledgers

recording the proceeds thus far collected and the balances outstanding for various drug transactions.

On December 30, 1993, through the wiretap placed on the telephone at Suarez's residence, the task force heard Suarez telephone defendant Isabel Morante, with whom Suarez apparently had an ongoing relationship, at her residence in Los Angeles. In that conversation, Suarez complained about the recent arrest of Molina. Both Suarez and defendant wondered aloud from what source the police had obtained the information leading to the arrest and seizures, and they discussed the possibility of examining Molina's police records to ascertain the source of that information. During the conversation, Suarez stated, "This is the kind of life that we chose to lead. So what can we do about it?" Defendant responded, "Uh-huh." When Suarez concluded, "Take the good with the bad," defendant chuckled.

On January 13, 1994, defendant contacted Rafael Flores, also known as Rafa, who previously had worked with defendant in a clothing business. Defendant told Flores that she had work for him and arranged to meet with him at her residence. At that meeting, defendant informed Flores that she could provide work for him transporting kilograms of cocaine, for which he would earn $8,000, and from which amount defendant would retain 25 percent. Flores agreed to do the job. Defendant told Flores that he would travel to Houston, Texas, and meet certain individuals. She warned him that the police were following her, and therefore Flores was not to telephone her at her residence. Defendant stated that instead, from a public telephone, Flores must telephone her pager number and she would return the page. She explained that if she and Flores followed that procedure, the police would be unable to record their telephone conversations.

On January 14, 1994, defendant drove Flores to the airport and paid cash for his airline ticket. Flores then boarded a flight to Houston and in that city checked into a Days Inn hotel, from which location he paged defendant, who remained in California. She telephoned in return and instructed Flores to page her again in one hour. Previously it had been agreed that Flores would not learn the identity of Suarez and would communicate solely with defendant. Accordingly, on that day, Suarez (who also remained in California) telephoned defendant at her residence, and when she told him that Flores had arrived in Houston, Suarez instructed her to give Flores a particular pager number and tell him to contact "Flip," using the code number 42.

Suarez then telephoned a number in Houston and spoke to an unidentified man. Suarez explained that Flores had arrived and would page the man, identify himself as number 42, and ask for Flip. Suarez instructed the man to

give Flores the cocaine "raw" because Flores knew how to "mask" it to avoid detection by drug-sniffing dogs. The man asked Suarez whether Flores knew where to go, and Suarez replied that defendant would inform Flores. Suarez and the man then agreed "to do Motown" (Detroit, Michigan) first.

In a telephone contact between Flores and defendant later that day, defendant gave Flores the pager number he was to telephone. Flores telephoned that number but received a busy signal, and subsequently informed defendant what had happened. Defendant then telephoned Suarez, informed him that Flores was at the hotel, and received a different pager number.

In her next telephone contact with Flores that day, defendant told Flores that two men would meet him at his hotel room. When the men arrived, they initially paged defendant, receiving her assurance that Flores was the correct contact. They gave Flores $2,000 and 10 kilograms of cocaine. Flores packaged the cocaine in Ziploc bags layered with mustard and fabric softener sheets in order to prevent detection by drug-sniffing dogs. Thereafter, Flores contacted defendant, telling her that he had received the cocaine. She instructed him to contact her in one hour to learn his destination. When Flores did so, he was instructed by defendant to travel to Detroit.

That evening, conducting surveillance, Officer McKnight and other officers, including a female who had dark curly hair and wore glasses, travelled in an unmarked vehicle to the vicinity of defendant's residence and parked. The officers observed Suarez enter defendant's residence, where he remained for a brief time.

On January 15, 1994, pursuant to defendant's instructions, Flores flew to Detroit, checking into a Comfort Inn hotel on the outskirts of the city. Flores then contacted defendant, and she instructed him to wait until noon when she would contact him.

Later on the morning of January 15, Suarez telephoned defendant, who was at a public telephone in Los Angeles. Suarez asked defendant whether she saw anything that "looked strange." Defendant responded that nothing looked strange, that there were fewer automobiles near her residence, and that she did not see the vehicle containing the small woman with short curly dark hair and glasses whom she and Suarez had observed from the residence the previous evening. Defendant gave Suarez a room number and a telephone number that proved to be the telephone number of a business located in a suburb of Detroit.

Suarez telephoned defendant again, asking whether she was at a public telephone. Initially, defendant responded affirmatively, but subsequently

admitted she was at a friend's residence. Suarez told defendant that after he learned the location at which Flores was to deliver the cocaine, Suarez would page defendant and simply record that three-digit room number. Suarez instructed defendant that when Flores arrived at the room, he was to ask for "Captain." Suarez told defendant to inform him when the delivery had been completed by paging him and recording the same three-digit room number. Subsequently, as planned, Suarez paged defendant and recorded the room number for Flores's meeting.

Defendant then contacted Flores, instructed him to proceed to a specific room number at the same hotel, knock three times, listen for three knocks in return, and deliver the cocaine to the occupant who answered the door. Flores made the delivery as instructed and departed. From a public telephone, Flores contacted defendant, telling her that the delivery had been completed. Defendant instructed him to return to Houston.

On January 16, 1994, Flores departed from Detroit and arrived back in Houston, where he checked into a Ramada Inn hotel. On January 17, 1994, Flores contacted defendant, who instructed him to contact her in 90 minutes. Flores did so, and defendant instructed him to wait in the hotel room for another delivery of 10 kilograms of cocaine. After approximately three hours, the same individuals who had made the first delivery came to his room and gave him another ten kilograms of cocaine. Flores packaged the cocaine as he had previously, using plastic baggies with mustard and fabric softener sheets. Flores then contacted defendant again, telling her that he had received the cocaine.

On January 17, 1994, Suarez telephoned defendant, who was at a public telephone. Defendant confirmed that Flores had received the cocaine but told Suarez that Flores had not been informed where to transport it. Suarez instructed her that Flores was to go to New Orleans, Louisiana. Defendant contacted Flores, telling him to proceed to New Orleans. Later, when Suarez contacted defendant, she told him she had talked to Flores and informed him of his destination and that Flores had told her everything was fine.

On January 18, 1994, Flores flew to New Orleans and checked into a Days Inn hotel in Kenner, a small town located outside New Orleans. Flores contacted defendant, informing her of the name and telephone number of the hotel and his room number. Defendant instructed Flores to contact her again in one hour. When Suarez contacted defendant, she gave him the hotel telephone number and Flores's room number. Later the same day, Suarez contacted defendant, complaining that Flores was not in New Orleans but in

"Tanner." Defendant responded that she had instructed Flores to stay in New Orleans and would contact him.

Apprised of this information through the wiretap of Suarez's telephone, Officer McKnight traced the telephone number, learned the location of Flores's hotel, and contacted a DEA task force located in New Orleans. Officer McKnight explained to one of its agents the nature of the investigation in Los Angeles and provided the information he had obtained regarding the name of the hotel, the telephone number, and Flores's room number. New Orleans Police Department Detective Ortiz, assigned to the DEA task force in New Orleans, proceeded to the Days Inn hotel in Kenner and commenced surveillance of Flores.

Later on January 18, 1994, when Flores telephoned defendant for instructions, she told him to wait in the room and someone would arrive to retrieve the cocaine. When no one appeared, Flores again contacted defendant, telling her that he did not "want to keep it in [his] hands." Defendant told him not to worry and to wait. Flores waited four or five days, and each day when he contacted defendant, she instructed him to wait. During this period, although the hotel rooms had private telephones, Detective Ortiz at least once or twice each day observed Flores leave his hotel room and proceed to a public telephone outside. Flores appeared to be making pager calls and several times received a return telephone call.

Finally, on January 21, 1994, defendant instructed Flores to transport the cocaine to Detroit. On January 22, 1994, Flores proceeded to the airport with a carry-on bag and a black suitcase. Detective Ortiz and other law enforcement officials followed him. After Flores checked in the black suitcase at the ticket counter, the officers approached Flores and asked him where he was traveling to and whether he had checked in any luggage. Flores denied doing so. The officers retrieved the black suitcase and escorted him to a security office at the airport. The officers searched the suitcase and discovered 10 kilograms of cocaine. The officers then arrested Flores. After being transported to the jail, Flores placed three collect telephone calls to defendant. She told him not to worry, because she would send an attorney. Thereafter, Attorney David Elden arrived to represent Flores. Flores subsequently pleaded guilty to transportation of cocaine.

On May 21, 1994, pursuant to a warrant, Officer McKnight and other members of the California-based task force arrested defendant and searched her residence. The officers located defendant's pager and her "Day Planner," containing the names Rob, Tony Vasquez, Rafa (Flores's nickname), the

name David Elden, and Flores's pager number. Officer McKnight also discovered documents with notations representing quantities of cocaine, wholesale prices per kilogram of cocaine in various parts of the country, and the total wholesale cost of the quantities described.

After receiving and waiving *Miranda* advisements,[1] defendant told Officer McKnight that she knew Suarez as Robinson Suarez and also as Rob and as Tony Vasquez. She admitted that she had recruited Flores to transport cocaine for Suarez and that she was the contact person between the two men. She admitted having knowledge that Flores was transporting cocaine. She stated that Suarez dealt 100 kilograms of cocaine per month.

The prosecution and the defense stipulated that the cocaine seized from Flores weighed more than 10 kilograms. Other evidence established that from late 1993 through early 1994, the wholesale price of a kilogram of cocaine was approximately $13,000 in California and somewhat higher in the Midwest and the East Coast. The average consumer of cocaine used approximately 1/10 of 1 gram of cocaine per ingestion. Thus, 1 kilogram of cocaine (1,000 grams) contained approximately 10,000 average doses. The street value of 1 gram of cocaine was approximately $100 and of 1 kilogram of cocaine, approximately $100,000. The sole purpose of possessing 10 kilograms of cocaine, with an approximate street value of $1 million, was for sale or resale.

Following the presentation of evidence, the trial court heard and denied defendant's motion to dismiss (Pen. Code, § 1118.1), made on the basis that defendant could not be guilty of either possession for sale or transportation of cocaine, or of conspiracy to possess for sale or to transport cocaine, because defendant did not commit any acts within this state amounting to an attempt to commit any of these offenses. The jury found defendant guilty of conspiracy to possess for sale and to transport cocaine (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, §§ 11351, 11352), possession for sale of cocaine exceeding 10 kilograms by weight (Health & Saf. Code, §§ 11351, 11370.4, subd. (a)), and transportation of cocaine exceeding 10 kilograms by weight (Health & Saf. Code, §§ 11352, 11370.4, subd. (a)).[2]

The trial court sentenced defendant to state prison for a total term of 14 years. The sentence consisted of the middle term of 4 years for transportation of cocaine, plus an enhancement of 10 years based upon the circumstance that the cocaine exceeded 10 kilograms by weight. The trial court

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

[2] All further statutory references are to the Penal Code unless otherwise indicated.

imposed a concurrent middle term of three years for possession of cocaine for sale, plus a concurrent enhancement of ten years based upon the weight of the cocaine. The trial court also imposed and stayed, pursuant to section 654, a middle term of four years for conspiracy to possess for sale and to transport cocaine.

Defendant appealed. The Court of Appeal reversed defendant's conviction of conspiracy to possess for sale and to transport cocaine. The Court of Appeal concluded that, although sections 27 and 778a appear to confer upon California courts jurisdiction over a conspiracy arising within this state to commit an offense that ultimately is committed in another jurisdiction, reversal nonetheless was mandated by our determination in *People* v. *Buffum* (1953) 40 Cal.2d 709 [256 P.2d 317], that these statutes do not confer such jurisdiction unless the acts committed within this state in furtherance of the conspiracy amount to an *attempt* to commit the underlying offense. The Court of Appeal affirmed defendant's convictions of possession for sale and transportation of cocaine, as well as the related enhancements based upon the weight of the cocaine. The appellate court concluded that California has jurisdiction over these offenses despite their completion outside this jurisdiction, based upon the acts committed by defendant within this state that aided and abetted the commission of the offenses.

The People sought review, urging that we overrule *People* v. *Buffum*, *supra*, 40 Cal.2d 709, and its progeny, and reinstate defendant's conviction of conspiracy on the basis that a defendant need not, in order to be convicted as a conspirator, commit acts within the state amounting to an attempt to commit an offense that ultimately is committed outside the state. Defendant also sought review, contending that the Court of Appeal erred in affirming her convictions of possession for sale and transportation of cocaine, because, by analogy to the reasoning in *People* v. *Buffum*, *supra*, 40 Cal.2d 709, regarding conspiracy, defendant's conduct occurring within this jurisdiction, aiding and abetting the commission of the offenses of possession for sale and transportation of cocaine, did not amount to an attempt to commit these offenses within this state. We granted both petitions for review of those issues.

## II

Below, we discuss the precedent of this court that compelled the Court of Appeal to reverse defendant's conviction of conspiracy to possess for sale and to transport cocaine. Initially, however, we briefly summarize several statutory and common law concepts of criminal liability and jurisdiction pertinent to that discussion.

A

Pursuant to section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime.[3] A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy. (§ 184; *People* v. *Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 789 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Backus* (1979) 23 Cal.3d 360, 390 [152 Cal.Rptr. 710, 590 P.2d 837]; *People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 174.)[4]

■ Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. (*Clune* v. *United States* (1895) 159 U.S. 590, 595 [16 S.Ct. 125, 126-127, 40 L.Ed. 269]; *Williams* v. *Superior Court* (1973) 30 Cal.App.3d 8, 10 [106 Cal.Rptr. 89]; *People* v. *Seter* (1963) 216 Cal.App.2d 238, 247 [30 Cal.Rptr. 759].)[5] As we recently explained in *People* v. *Swain, supra,* 12 Cal.4th 593, 599-600, "Conspiracy is an inchoate crime. [Citation.] It does not require the

[3]As specified in subdivision (a) of section 182, the object of a conspiracy may be: (1) to commit "any crime," as in the present case; (2) falsely and maliciously to indict another for a crime or to procure another to be charged with a crime; (3) falsely to maintain an action; (4) to defraud a person of property by criminal means, or to obtain property by false pretenses; (5) to commit any act injurious to public health or morals, or to obstruct justice or the due administration of laws; or (6) to commit any crime against a person holding one of certain enumerated positions of high office.

[4]Section 184 provides: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done." The United States Supreme Court, in explaining the basis for an analogous requirement in a federal conspiracy statute, stated that the provision that " 'there must be an act done to effect the object of the conspiracy, merely affords a *locus penitentiae,* so that before the act is done, either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute.' " (*Hyde* v. *United States* (1912) 225 U.S. 347, 358 [32 S.Ct. 793, 798, 56 L.Ed. 1114]; see also *United States* v. *Shabani* (1994) 513 U.S. 10, 13-15 [115 S.Ct. 382, 384-385, 130 L.Ed.2d 225] [pursuant to 21 U.S.C. § 846 (conspiracy to distribute cocaine), and at common law, an overt act is not required].)

[5]Because conspiracy is a distinct offense, it is a matter for legislative determination whether to punish a conspiracy to do an act more severely than the doing of the act itself. (*People* v. *Koch* (1970) 4 Cal.App.3d 270, 276 [84 Cal.Rptr. 629] [upholding constitutionality of punishment scheme making violation of Unemp. Ins. Code, § 2101 a misdemeanor but conspiracy to violate that statute a felony]; *People* v. *Holstun* (1959) 167 Cal.App.2d 479, 486-487 [334 P.2d 645].) The rationale for punishing conspiracy more severely than the offense that is the object of the conspiracy is that a conspiracy increases the likelihood that the criminal object successfully will be attained, and "makes more likely the commission of

commission of the substantive offense that is the object of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and 'thus reaches further back into preparatory conduct than attempt . . .' (Model Pen. Code & Commentaries (1985) com. 1 to § 5.03, pp. 387-388.) [¶] . . . In some instances, the object of the conspiracy 'is defined in terms of proscribed conduct.' [Citation.] In other instances, it 'is defined in terms of . . . a proscribed result under specified attendant circumstances.' [Citation.]" (Fn. omitted.)

" ' "In contemplation of law the act of one [conspirator] is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences . . . ." ' " (*People* v. *Harper* (1945) 25 Cal.2d 862, 871 [156 P.2d 249]; *People* v. *Benenato* (1946) 77 Cal.App.2d 350, 356 [175 P.2d 296], disapproved on another ground in *In re Wright* (1967) 65 Cal.2d 650, 654-666 [56 Cal.Rptr. 110, 422 P.2d 998]; *People* v. *Stoddard* (1941) 48 Cal.App.2d 86, 89 [119 P.2d 160].) Thus, "[i]t is not necessary that a party to a conspiracy shall be present and personally participate with his co-conspirators in all or in any of the overt acts." (*People* v. *Benenato*, *supra*, 77 Cal.App.2d at p. 356.)

■ It is well established that one may become criminally liable for possession for sale or for transportation of a controlled substance, based upon either actual or constructive possession of the substance. (*People* v. *Rogers* (1971) 5 Cal.3d 129, 134 [95 Cal.Rptr. 601, 486 P.2d 129].) Constructive possession exists where a defendant maintains some control or right to control contraband that is in the actual possession of another. (*Ibid.*) In the present case, the jury was so instructed. Similarly, a defendant may be liable for constructive transportation of a controlled substance. (*Ibid.*) A defendant also may be convicted of possession or transportation of a controlled substance when his or her dominion and control are exercised through the acts of an agent. (*People* v. *White* (1958) 50 Cal.2d 428, 431 [325 P.2d 985] [the defendant's guilt was based upon his agent's purchase of heroin at the

crimes unrelated to the original purpose for which the combination was formed." (*Callanan* v. *United States* (1961) 364 U.S. 587, 594 [81 S.Ct. 321, 325, 5 L.Ed.2d 312]; see *People* v. *Zamora* (1976) 18 Cal.3d 538, 555-556 [134 Cal.Rptr. 784, 557 P.2d 75].) Collaboration in a criminal enterprise significantly magnifies the risks to society by increasing the amount of injury that may be inflicted. Public policy therefore requires that criminal conspirators be held liable whether or not their scheme actually is carried out, thus justifying intervention by the state at an earlier stage in the course of that conduct. (*People* v. *Liu* (1996) 46 Cal.App.4th 1119, 1130 [54 Cal.Rptr.2d 578]; *People* v. *Tatman* (1993) 20 Cal.App.4th 1, 8 [24 Cal.Rptr.2d 480]; *People* v. *Pangelina* (1981) 117 Cal.App.3d 414, 419-420 [172 Cal.Rptr. 661]; *People* v. *Williams* (1980) 101 Cal.App.3d 711, 721 [161 Cal.Rptr. 830].)

defendant's direction]; *People* v. *Blunt* (1966) 241 Cal.App.2d 200, 204 [50 Cal.Rptr. 440]; *People* v. *Graves* (1948) 84 Cal.App.2d 531, 534 [191 P.2d 32]; 2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Public Peace and Welfare, § 1004, p. 1138.)

It also is established that one may be guilty of *conspiring* to possess for sale or to transport a controlled substance without physically possessing it. (See, e.g., *People* v. *Price* (1989) 210 Cal.App.3d 1183 [259 Cal.Rptr. 282] [the defendant was convicted of conspiring to transport and sell cocaine, as well as transporting and selling cocaine, although he was neither a party to the negotiations preceding sale nor present at the time of the sale].) As the court observed in *People* v. *Howard* (1995) 33 Cal.App.4th 1407, 1415 [39 Cal.Rptr.2d 766], in considering the weight enhancement provided by Health and Safety Code section 11370.4 for a conviction of possession for sale, transportation, or *conspiracy* to possess for sale or transport a controlled substance, "[b]y including [conspiracy to possess for sale or to transport a controlled substance] with those [offenses] giving rise to the enhancement, it reasonably can be inferred the Legislature intended to target those individuals who do not possess or have physical contact with the controlled substance." (33 Cal.App.4th at p. 1415.)

We turn next to our state statutes defining jurisdiction over criminal acts. Generally, pursuant to section 777, a "person is liable to punishment by the laws of this State, for a public offense committed by him therein," except where the offense is cognizable exclusively in federal court. In addition, pursuant to section 27, subdivision (a)(1), persons may be punished "under the laws of this state" if they "commit, in whole or in part, any crime within this state."[6] Pursuant to section 778a, subdivision (a), a person is punishable in the same manner as if the crime had been committed entirely within this state if the person does "any act" within this state "in execution or part execution" of an intent to commit a crime anywhere, culminating in its commission within or without the state.[7] Thus, these statutes appear to provide California with jurisdiction to prosecute and punish a conspiracy if the defendants agreed to commit a crime and at least one of the defendants

---

[6]Section 27, subdivision (a), provides: "The following persons are liable to punishment under the laws of this state: [¶] (1) All persons who commit, in whole or in part, any crime within this state. [¶] (2) All who commit any offense without this state which, if committed within this state, would be larceny, carjacking, robbery, or embezzlement under the laws of this state, and bring the property stolen or embezzled, or any part of it, or are found with it, or any part of it, within this state. [¶] (3) All who, being without this state, cause or aid, advise or encourage, another person to commit a crime within this state, and are afterwards found therein."

[7]Section 778a, subdivision (a) provides: "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is

committed an act to effectuate the object of the conspiracy within this state, even though the object crime itself was committed in another jurisdiction.

This court nonetheless has held otherwise. In *People v. Buffum, supra,* 40 Cal.2d 709 (hereafter, *Buffum*), the defendants, based upon their agreement and the overt acts (such as transporting patients) in which they engaged within California, were convicted of conspiracy to commit abortions (at that time unconditionally illegal, other than to preserve the life of the pregnant woman, pursuant to section 274) that actually were performed in Mexico by a person other than the defendants, one of whom assisted in the procedure. We concluded, as a matter of statutory interpretation of sections 182 and 274, that the Legislature did not intend to regulate conduct occurring outside California, and therefore the defendants could not be convicted of conspiring to perform abortions outside California, unless another California statute established jurisdiction to prosecute the performance of extraterritorial acts. (40 Cal.2d at pp. 714-715.)

In *Buffum*, the People contended that California had jurisdiction over the defendants' offenses pursuant to then section 27, subdivision 1, and pursuant to then section 778a. This court determined that those statutes did not confer jurisdiction upon California to prosecute the defendants for conspiracy if the offense that was the object of the conspiracy was committed outside the state. (*Buffum, supra,* 40 Cal.2d at pp. 715-717.) We observed that both sections had been (or should be) construed to apply to offenses committed outside the state only in the circumstance in which the acts done within the state were sufficient to amount to an *attempt* to commit a crime. (*Ibid.*) We further observed that two elements are "necessary to establish an attempt, namely, a specific intent to commit a crime and a 'direct' ineffectual act done towards its commission." (*Id.* at p. 718.) We concluded that no direct ineffectual act toward commission of the abortions had occurred within the state, and thus the defendants were not guilty of conspiracy. (*Ibid.*)[8]

In *People v. Burt* (1955) 45 Cal.2d 311 [288 P.2d 503, 51 A.L.R.2d 948] (hereafter, *Burt*), this court (the same six justices as well as the dissenting justice in *Buffum,* signed the unanimous decision) confirmed our earlier conclusion in *Buffum* that section 182 may be applied only if the commission

---

punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state."

[8]*Buffum* is a plurality opinion. Two other justices wrote (and one other justice joined) concurring opinions agreeing with the reasoning and result of the part of the plurality opinion that addressed and resolved the issue involved in the present case. (See *Buffum, supra,* 40 Cal.2d 709, 715-718 (plur. opn. of Gibson, C. J.); *id.* at pp. 726-727 (conc. opn. of Spence, J.); *id.* at p. 728 (conc. opn. of Schauer, J.).) One member of the court dissented. (*Id.* at pp. 730-731 (dis. opn. of Shenk, J.).)

of the underlying offense, or at minimum, an attempt to commit the offense, occurs within this state. In *Burt*, the defendant was convicted pursuant to section 653f of soliciting a woman to persuade men to travel with her to Mexico to engage in sexual intercourse and, once in that country, to commit acts in concert with the defendant that would constitute extortion under section 518. We upheld the defendant's conviction, distinguishing the decision in *Buffum* reversing a conviction based upon an in-state conspiracy to commit an out-of-state offense, by distinguishing the crime of solicitation from the crime of conspiracy. (45 Cal.2d at pp. 313-315.)

In *Burt*, we stated: "In the present case, however, we are not concerned with a statute prohibiting a conspiracy 'to commit any crime,' however petty, or to commit the numerous other acts listed in section 182. Two or more persons may conspire to commit an act in another state that would not be a crime there but would be a crime if committed in this state, or that would not be a crime here but would be a crime in the other state. . . . Section 653f, however, prohibits the solicitation of only 12 of the most serious crimes, all of which are felonies under the law of this state and at common law and are crimes under the law of all civilized nations. Since the Legislature is not ordinarily concerned with regulating conduct in other jurisdictions (*People* v. *Buffum, supra*, 40 Cal.2d 709, 716), and since section 182 suggests no answer to the many difficult questions that would otherwise arise from the conflict in California law and the law of other states, that section may reasonably be interpreted as limited to conspiracies to commit crimes in this state. It does not follow, however, that when the Legislature has singled out the solicitation of the most serious of crimes, it likewise intended to punish their solicitation only when they were to be committed in this state. Legislative concern with the proscribed soliciting is demonstrated not only by the gravity of the crimes specified but by the fact that the crime, unlike conspiracy, does not require the commission of any overt [act]. It is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation. [Citations.] Section 653f is concerned not only with the prevention of the harm that would result should the inducements prove successful, but with protecting inhabitants of this state from being exposed to inducements to commit or join in the commission of the crimes specified [citation], and the evils it seeks to prevent are present whether the object of the solicitation is to be accomplished within or without this state. Thus, in the present case defendant used the prospects of large monetary rewards to attempt to induce the prosecutrix to commit acts of prostitution and extortion, with residents of this state as intended victims. Such solicitation is inimical to the public welfare and to the safety and morals of the inhabitants of this state, regardless of where the solicited acts are to be performed, and

a construction of section 653f that limits its operation to solicitation of acts that are to be consummated within this state would defeat, rather than effect, the object of that statute. [Citation.]" (*Burt, supra,* 45 Cal.2d 311, 313-314.)[9]

Subsequently, in *People* v. *Anderson* (1961) 55 Cal.2d 655 [12 Cal.Rptr. 500, 361 P.2d 32] (*Anderson*), we reiterated the observation made in *Buffum* and *Burt* that the Legislature ordinarily is not concerned with regulating conduct in other jurisdictions. (55 Cal.2d 655, 662.) In that case (in which conspiracy was not alleged), we nonetheless affirmed the defendants' convictions of grand theft and attempted grand theft involving offenses committed pursuant to a scheme whereby, within California, the defendants told each victim that he would win money at a fixed gambling game in Las Vegas, Nevada, and in the completed theft offense, the defendants made further false representations and obtained the victim's money in Nevada after he withdrew cash and traveled to Las Vegas in reliance upon the defendants' representations. In *Anderson*, we determined that the misrepresentations made and requisite intent formed—within California (even though additional misrepresentations were required out of state to consummate the larceny)—constituted an in-state attempt to commit larceny by fraud, trick, or device, and thus that the crimes were commenced in California. We relied also upon the circumstances that this state was where the victims resided and where the victims' property was located. (*Id.* at pp. 661-662.)[10]

Notwithstanding our subsequent endorsements, the decision in *Buffum* has been criticized in a number of treatises. One author stated that the *Buffum* case "stands as an excellent example of the triumph of the rote of the territorial principle over the pragmatic needs of law enforcement." (George, *Extraterritorial Application of Penal Legislation* (1966) 64 Mich. L.Rev. 609,

[9]We note that in recent years the statute that was the subject of the *Burt* case has been amended on numerous occasions to increase the number of offenses that may give rise to prosecution for solicitation.

[10]The Courts of Appeal have cited the decision in *Buffum* in generally construing restrictively the jurisdiction of this state to prosecute offenses other than conspiracy initiated within this state, but completed in another jurisdiction. (See *People* v. *Chapman* (1977) 72 Cal.App.3d 6, 10-11 [139 Cal.Rptr. 808] [vehicle theft conviction reversed because jury instruction failed to inform jury that the defendant must form the intent to steal, as well as actually take the vehicle, in California]; *People* v. *Utter* (1972) 24 Cal.App.3d 535, 550 [101 Cal.Rptr. 214] [murder conviction reversed where within California, the defendant induced the victim to travel abroad, purchased the defendant's and the victim's airline tickets, acquired the apparent murder weapon, and may have formed the intent to murder, but the murder itself was committed outside the state]; see also *People* v. *Gerchberg* (1982) 131 Cal.App.3d 618, 620 [181 Cal.Rptr. 505] [conviction for concealment of children from legal custodian reversed because the defendant formed the intent and concealed the children while residing with them in New York, and did not attempt to commit the offense in California]; cf. *People* v. *Monteverde* (1965) 236 Cal.App.2d 630, 637-638 [46 Cal.Rptr. 206] [declining to apply *Buffum* to offense of offering narcotic for sale].)

625-627 [also stating that Model Pen. Code, § 1.03(1)(d) implicitly repudiated the rule of *Buffum* by permitting prosecution of conspiracies in state or attempts to commit crimes out of state].) Another commentator challenged the assumption made in *Buffum* that the Legislature did not intend to regulate conduct taking place outside state borders and criticized the *Burt* decision for distinguishing rather than discrediting *Buffum*. (Currie, *Justice Traynor and the Conflict of Laws* (1961) 13 Stan.L.Rev. 719, 745-748.) One commentator noted that the *Buffum* decision ignored the circumstance that both the underlying conduct and the resulting harm of the conspiracy occurred within the state. (Rotenberg, *Extraterritorial Legislative Jurisdiction and the State Criminal Law* (1960) 38 Tex. L.Rev. 763, 780; see also *Developments in the Law—Criminal Conspiracy* (1959) 72 Harv. L.Rev. 920, 945; Case Notes: *Criminal Law—Solicitation—Territorial Limits on Criminal Jurisdiction* (1956) 29 So.Cal.L.Rev. 363, 365-367 (hereafter, *Territorial Limits on Criminal Jurisdiction*) [noting the theoretical inconsistency between *Buffum* and *Burt*].)

B

 In reflecting upon the Court of Appeal's reluctant application of *Buffum* in the present case to reverse the conviction of conspiracy to possess for sale and to transport cocaine (but not reverse the convictions of simple possession for sale and transportation of cocaine), we have had occasion to reconsider the validity of the rule enunciated in the *Buffum* decision. We have determined that the rule is inconsistent with the principles that define the crime of conspiracy and the rationale for punishing the commission of that offense, does not conform to the legislative intent expressed in sections 27, subdivision (a)(1), and 778a, subdivision (a), regarding the scope of California's jurisdiction, is not mandated by other doctrines or provisions constraining state jurisdiction over criminal conduct that may involve more than one jurisdiction, and does not accommodate considerations of public policy that have assumed greater importance in recent years. We also have determined that the doctrine of legislative acquiescence in the wake of that decision does not command us, or persuade us, to adhere to that rule.

As explained above, conspiracy does not require the commission of the substantive offense that is the object of the conspiracy. (*People v. Swain, supra,* 12 Cal.4th 593, 599-600.) " 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and '*thus reaches further back into preparatory conduct than attempt . . . .*' [Citation.]" (*Id.* at p. 600, italics added.) Having recognized those aspects of the crime of conspiracy, we cannot also continue to maintain, as did the court's decision in *Buffum*, that section 182 must be interpreted to encompass a conspiracy—where its object offense is committed out of state—*only*

if the overt acts permitting a conspiracy to be charged amount to an attempt, within the state, to commit the underlying offense.

An attempt to commit a crime is itself a crime. (§ 664; see, e.g., *People* v. *Bright* (1996) 12 Cal.4th 652, 670-671 [49 Cal.Rptr.2d 732, 909 P.2d 1354].) Therefore, our analysis in *Buffum* rests upon the premise that our state's power to regulate conspiratorial conduct arising within the state, the criminal object of which is intended to occur outside the state, exists only when a distinct offense is committed wholly within the state—that of attempted commission of the object offense.

Our criminal conspiracy statutes clearly contemplate, however, that conduct justifying the state's regulation of conspiracy—that is, subjecting the perpetrator of conspiratorial acts to criminal liability—has occurred when, within the state, an agreement to commit an offense has been entered into and ratified by the commission of an act within the state designed to effect the object of the conspiracy. (§§ 182, 184.) "The state is attempting to prevent the ultimate harm which would result if the proposed scheme were executed, and the aforementioned elements coupled together provide the state with a sufficient indication of the genuineness of the danger to label those acts criminal, apart from the consummation of the proposed plan." (*Territorial Limits on Criminal Jurisdiction, supra*, 29 So.Cal.L.Rev. at p. 363.)

For example, if an organization of conspirators were established in which some members met in order to contrive to commit murders of California citizens within our borders, proceeding to purchase firearms suitable for that purpose at a local gun shop, while other members met in order to make arrangements to commit murders of our state's citizens in the State of Nevada, proceeding to purchase suitable firearms at the same gun shop, it is apparent that the social harm engendered by the activities of the second group is equally as compelling as that created by the activities of the first group. It would be illogical to conclude, in accordance with the rule described in *Buffum*, that our laws penalizing conspiracy would permit California law enforcement authorities to prosecute the first group for that offense but not the second group.

In addition, if the state may seek the prosecution and punishment of an agreement and overt act (coupled with the requisite intent) amounting to conspiracy *regardless* whether the crime that is the object of the conspiracy is completed, it is not apparent why we should interpret these statutes to require, at the same time, that the location of the intended crime be within the state. The agreement and overt act comprising the criminal offense have taken place within the state. It is that conduct (and intent), arising entirely

within the state, that the statutes sanction criminally. We logically cannot hold that those elements of the offense are sufficient to attach criminal liability to the conspirators when they intend to accomplish the criminal objective—even if they do not meet that objective, within the state—but are not sufficient, and must be accompanied by an attempt within the state to commit the crime, when the conspirators intend to consummate the criminal objective outside the state.

Nor is such a result dictated by, or consistent with, the express terms and evident legislative intent of the statutes setting forth California jurisdiction to punish criminal conduct that either is committed wholly within this state, or that arises, even if it is not consummated, within this state. As we have seen, an agreement together with overt acts in furtherance of a criminal object that occur within this state afford jurisdiction to punish the conspirators pursuant to section 27, subdivision (a)(1), "under the laws of this state," because the conspirators have committed, "in whole or in part, a[] crime within this state." It also is apparent, when as in the present case the conspirators agree to commit a crime and commit acts in furtherance of their agreement within the state and ultimately do commit the crime within another jurisdiction, that the conspirators are punishable pursuant to section 778a, subdivision (a), because they have done an act within this state in "whole or part execution" of an intent to commit a crime, culminating in its commission, "within or without this state."

Having concluded that the analysis in *Buffum* does not appear to be consistent either with the definition of the elements or the purpose in making criminal the offense at issue, or with the express terms of the statutes conferring criminal jurisdiction in order to sanction conduct arising in this state, even if not consummated in this state, we next revisit the concerns expressed in *Burt* relating to extraterritorial application of our conspiracy laws. In that case, in which we upheld a conviction for solicitation within this state to commit an offense in another jurisdiction, in part because the solicitation, to be criminal, must be to commit a very serious felony under the law of this state that also is recognized as a crime in "all civilized nations," we effectively cautioned against a similar application of conspiracy, which may be to commit "any crime" or any one of certain other enumerated acts. Noting that a conspiracy may be directed at committing an act that might not be a crime in a foreign jurisdiction but is recognized as a crime in this state or that would not be criminal in California but would be a crime in the other jurisdiction, we approved of the limitation of section 182 to conspiracies to commit crimes within the state, and cited the "many difficult questions that would otherwise arise from the conflict in California law and the law of other states." (*Burt, supra,* 45 Cal.2d 311, 314.)

We now consider whether the concerns arising from such differences in state law preclude our holding that a person may be guilty in California of conspiracy to commit a crime based upon an agreement and acts in furtherance thereof *not* amounting to an attempt within this state to commit the underlying offense, when the offense itself is committed in another jurisdiction.[11] We conclude these concerns do not preclude such a holding.

First, section 182, subdivision (a)(1), in specifying that a conspiracy must be to commit *any crime*, contemplates an act that is criminal as defined by the standards of this state. That conclusion is reflected in our often repeated comment that the Legislature does not intend to regulate conduct occurring in another state. This state would have no interest in punishing a conspiracy arising within this state to violate the criminal laws of another state if the conduct proscribed in the foreign jurisdiction would not be illegal if committed in California. For example, earlier in the history of this nation, within other jurisdictions, certain laws provided for, and penalized the refusal to abide by, racial segregation in various public locations. (See, e.g., *Plessy* v. *Ferguson* (1896) 163 U.S. 537, 548-552 [16 S.Ct. 1138, 1142-1144, 41 L.Ed. 256] [upholding the constitutionality of a state act requiring a railroad to provide separate accommodations for passengers according to their race and subjecting to criminal sanctions persons refusing to sit in their assigned areas]; *Browder* v. *Gayle* (M.D.Ala. 1956) 142 F.Supp. 707, 711 [declaring unconstitutional local ordinances requiring racial segregation on public transportation and imposing criminal sanctions upon persons violating these ordinances].) Our conspiracy statutes do not penalize an agreement, nor acts in furtherance of an agreement, to engage in conduct within another jurisdiction violative of the criminal law in the other jurisdiction if that conduct would not constitute "any crime" within this state.

Second, the obverse concern expressed in *Burt*, that a conspiracy may arise in state to commit an act out of state that might not be a crime in the

---

[11]The conduct that defendant herein agreed and intended to engage in clearly was a "crime" within the meaning of section 182, subdivision (a)(1), rather than one of the acts that are not (or may not be) crimes, as specified in other subdivisions of section 182. Therefore, we need not and do not decide whether our reevaluation of section 182, determining that it also applies when the object offense is consummated out of state even in the absence of an in-state attempt, may encompass other, noncriminal acts referred to within other subdivisions of that section.

We note in passing, however, that section 182, by expressly permitting the punishment of a conspiracy directed at the commission of other specified acts that are not necessarily criminal, reflects a legislative determination that a conspiracy arising in this state to commit these acts *in itself* justifies a criminal sanction, apart from the criminality of the object of the conspiracy. Therefore, even the possibility that an act might be criminal in a foreign jurisdiction but is not recognized as such in our jurisdiction, does not justify retaining the rule of *Buffum*. The Legislature clearly intended to prevent the occurrence of certain noncriminal conduct (and *only* those forms of noncriminal conduct it has designated), whatever the criminal status of that conduct in another jurisdiction.

foreign jurisdiction but would be a crime if committed in this state, does not warrant adding to the traditional features of liability for conspiracy the requirement of an attempt within the state to commit the offense. In the present case, the People merely have urged that we abandon the requirement of an attempt within the state when, as here (and as recognized by the parties), the conspirators' intended goals—possessing for sale and transporting cocaine—are recognized as criminal offenses both in this state and in foreign jurisdictions. We reserve for another day the issue whether a conspiracy in state to commit an act criminalized in this state but not in the jurisdiction in which the act is committed, also may be punished under California law.

We have concluded, as a threshold matter, that the potential for conflict with the laws of other jurisdictions that define what is criminal does not in itself preclude our foregoing interpretation of this state's jurisdiction over conspiracy to commit any crime. We now consider whether, nonetheless, there are other constitutional doctrines or statutory provisions bearing upon potential criminal law enforcement by more than one jurisdiction, that require or support adherence to our previous interpretation of conspiracy in this context.

We observe that the protections afforded an individual from twice being placed in jeopardy for the same criminal conduct do not mandate that prosecution of a conspiracy within the state to commit an offense outside the state may be maintained only when there also has been an attempt within California to commit the underlying offense. In fact, these protections support our revised view of this state's jurisdiction over the offense of conspiracy.

The federal Constitution does not preclude both the federal and state governments from prosecuting and convicting a defendant for the same act or acts. (*Abbate* v. *United States* (1959) 359 U.S. 187, 194-195 [79 S.Ct. 666, 670-671, 3 L.Ed.2d 729]; *Bartkus* v. *Illinois* (1959) 359 U.S. 121, 132-138 [79 S.Ct. 676, 682-686, 3 L.Ed.2d 684]; *People* v. *Comingore* (1977) 20 Cal.3d 142, 145 [141 Cal.Rptr. 542, 570 P.2d 723]; *People* v. *Belcher* (1974) 11 Cal.3d 91, 96-97 [113 Cal.Rptr. 1, 520 P.2d 385].) Nor does the protection against double jeopardy afforded by the Fifth Amendment bar the governments of two different states from prosecuting and convicting a defendant for the same act. (*Heath* v. *Alabama* (1985) 474 U.S. 82, 89 [106 S.Ct. 433, 437-438, 88 L.Ed.2d 387].)

Nonetheless, a state is not precluded from providing greater protection against double jeopardy than that afforded by the federal Constitution as

interpreted by decisions of the United States Supreme Court. (*People* v. *Comingore, supra*, 20 Cal.3d 142, 145; *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 601 [119 Cal.Rptr. 302, 531 P.2d 1086]; *People* v. *Belcher, supra*, 11 Cal.3d 91, 97.) A number of states, including California, have enacted statutes seeking to avoid dual prosecutions and convictions in state and federal courts, or in two state courts, for the same act. (11 Cal.3d at pp. 96-97.)

In this state, section 793 provides: "When an act charged as a public offense is within the jurisdiction of another State or country, as well as of this State, a conviction or acquittal thereof in the former is a bar to the prosecution or indictment therefor in this State." In addition, section 656 provides: "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of another State, Government, or country, founded upon the act or omission in respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense." In essence, section 793 bars a subsequent prosecution, and section 656 bars a subsequent trial, when the defendant has been convicted or acquitted of the same act or offense in another jurisdiction. (*People* v. *Comingore, supra*, 20 Cal.3d 142, 148; *People* v. *Brown* (1988) 204 Cal.App.3d 1444, 1450 [251 Cal.Rptr. 889].)[12] These statutes could be invoked to preclude an additional prosecution or conviction if, in the present case, for example, the federal government already had prosecuted and convicted (or acquitted) defendant of conspiracy to possess for sale and transport cocaine, based upon the same acts.

Thus, the Legislature has provided by statute that acts resulting in conviction or acquittal in federal court or the court of another state may not be the

---

[12]As we have observed, the "act" described in section 656 refers to the physical act or conduct of the defendant for which he or she is prosecuted. (See, e.g., *People* v. *Comingore, supra*, 20 Cal.3d 142, 146-147.) When the act upon which the conviction of another jurisdiction is based is the same as that prosecuted in California, the defendant may not also be convicted in this state. (*Id.* at pp. 147-149 [California prosecution of a defendant who removed the victim's automobile from her property in California without her permission and drove to Oregon, for grand theft auto and unlawful taking of the vehicle, was barred because it was based on the same physical act that resulted in the defendant's conviction in Oregon for unauthorized use of a vehicle]; *People* v. *Belcher, supra*, 11 Cal.3d 91, 96-100 [conviction of assault with a deadly weapon on a federal officer reversed because the defendant previously was acquitted in federal court of assault on the federal officer; robbery counts not previously charged were affirmed]; *People* v. *Brown, supra*, 204 Cal.App.3d 1444, 1448 [California conviction of burglary was not barred on the basis that the defendants previously were convicted in federal court in Nevada of conspiracy to transport in interstate commerce stolen property obtained in the California burglary]; *People* v. *Walker* (1981) 123 Cal.App.3d 981, 983-984 [177 Cal.Rptr. 147] [California conviction of the defendant for robbery of an American Express office was not barred where he previously was convicted in Nevada of receiving stolen property, consisting of traveler's checks obtained in that robbery]; *People* v. *Candelaria* (1956) 139 Cal.App.2d 432, 438-441 [294 P.2d 120] [state conviction of the defendant based on bank robbery was barred by federal conviction for the same act].)

subject of additional prosecution or conviction in California. That circumstance does not compel us to conclude that a person who has the requisite intent and commits all of the acts necessary to be found guilty of a conspiracy if.the underlying crime had been committed in this state, may not be prosecuted or convicted of conspiracy at all, merely because the underlying offense was committed in another state. When no prosecution or conviction for those acts has occurred in the other jurisdiction, the defendant has not been placed twice in jeopardy. Instead, the existence of these statutory protections confirms the appropriateness of our determination that participation in a conspiracy within this state, consisting of an agreement and acts in furtherance of the commission of the underlying offense but not amounting. to an *attempt* to commit the offense, properly *may* be subject to prosecution in this state under those circumstances.

We conclude moreover, that a number of general policy considerations support our departure from our formerly held interpretation of this state's jurisdiction over conspiracy offenses. As we observed in *Anderson, supra,* 55 Cal.2d 655, the case in which the defendants "set up" victims in California for thefts to be concluded in Nevada, "California has a legitimate interest in applying its penal sanctions to those who by misrepresentations in this state lure persons and their property from this state to another jurisdiction for the purpose of there appropriating the property." (*Id.* at p. 662.) As was pointed out by the Court of Appeal in the present case, pursuant to a *state's power to protect its citizens* the state's sovereign power should be exercised when the public of the state has been threatened or suffered some injury justifying imposition of criminal sanctions. (*Territorial Limits on Criminal Jurisdiction, supra,* 29 So.Cal.L.Rev. at p. 365.) That legitimate interest is no less real or compelling when persons within this state enter into an agreement to commit a crime and carry out overt acts in furtherance of that objective, even if these persons ultimately commit the crime within another state.

In addition, we must take account of the circumstance of "the ever-increasing frequency of criminal acts and transactions which transcend artificial, historical boundaries between states." (George, *Extraterritorial Application of Penal Legislation, supra,* 64 Mich. L.Rev. at p. 626.) It would be antithetical to the pragmatic goals and purposes of law enforcement to conclude in the present case that, under compulsion of *Buffum,* defendant's participation within this state in the agreement and numerous acts intended to effectuate the transactions of a multinational enterprise engaged in the possession, transportation, and sale of large quantities of controlled substances may not be punished pursuant to our state's criminal sanctions because defendant did not also attempt to possess for sale or transport the contraband within the borders of California. Defendant's activities within

this state endangered its citizens and placed a burden on courts and on law enforcement agencies within this state that were required to devote time and resources to monitoring and curtailing those activities, regardless whether the ultimate object of those activities occurred within another jurisdiction. It is appropriate that defendant be subject to the jurisdiction of our laws.

Finally, we need to examine whether, despite the apparent breadth of the legislation authorizing criminal sanctions against those who partially commit an offense within this state, or who do any act within this state in partial execution of an intent to commit a crime wherever it is committed, the Legislature's failure to abrogate the holding in *Buffum* nonetheless illustrates that its intent is reflected in that holding. In this regard, defendant offers both a specific and a general argument against modifying *Buffum*'s interpretation of the legislation in question.

Defendant raises the specific point that the Legislature's 1991 amendment of section 778a, unaccompanied by any attempt to modify that statute to overrule the interpretation it was given by this court in *Buffum*, bespeaks its acquiescence in our interpretation.[13] ■ "[W]here the Legislature amends a statute without altering a consistent and long-standing judicial interpretation of its operative language, courts generally indulge in a presumption that the Legislature has ratified that interpretation. [Citation.] Nevertheless, '[t]he presumption of legislative acquiescence in prior judicial decisions is not conclusive in determining legislative intent. As we also have stated: "Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval . . . . But something more than mere silence is required before that acquiescence is elevated into a species of implied legislation . . . . [Citations.] In the area of statutory construction, an examination of what the Legislature has done (as opposed to what it has left undone) is generally the more fruitful inquiry." . . . .' " (*People* v. *Escobar* (1992) 3 Cal.4th 740, 750-751 [12 Cal.Rptr.2d 586, 837 P.2d 1100]; see also *People* v. *King* (1993) 5 Cal.4th 59, 76-77 [19 Cal.Rptr.2d 233, 851 P.2d 27].)

■ The Legislature's addition of section 778a, subdivision (b), in 1991 did not affect the portion of the statute directing that a person who commits any act within this state, in partial execution of an intent to commit a crime, that culminates in the commission of a crime outside the state, may be

---

[13]Section 778a was amended in 1991 to add subdivision (b), which provides: "Whenever a person who [*sic*], within this state, kidnaps another person within the meaning of Sections 207 and 209, and thereafter carries the person into another state or country and commits any crime of violence or theft against that person in the other state or country, the person is punishable for that crime of violence or theft in this state in the same manner as if the crime had been committed within this state." (Stats. 1991, ch. 635, § 1, p. 2940.)

punished for *that* crime in this state in the same manner as if the crime had been committed entirely within this state. In fact, the statutory amendment focuses upon the situation in which a defendant commences one offense (kidnapping) within this state and then, in addition to continuing that offense out of state, commences and completes *new* offenses against the victim (crimes of violence or theft) entirely outside the state, the statute expressly conferring jurisdiction over those additional offenses. Our decision in *Buffum*, concerning the extent to which a conspiracy must progress within this state in order to be prosecutable when its criminal objective is accomplished outside the state, is not implicated by the addition of a subdivision intended to address jurisdiction over *new* out-of-state offenses that are committed in the course of a kidnapping that is commenced within the state.[14]

The argument also may be made that, in more general terms, the decision in *Buffum* has been in existence for approximately 46 years, during which time the Legislature has had ample opportunity, but has not acted, to abrogate it, and therefore, the principle of stare decisis commands that we adhere to it. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 951-952, pp. 995-998.) We do not believe those factors outweigh the foregoing concerns we have expressed that the *Buffum* rule is inconsistent with the express language of the several applicable statutes, that the rule runs counter to practical considerations and public policy affecting modern-day law enforcement in the context of multijurisdictional organized criminal efforts, and that, over the years, retention of the rule has resulted in its inconsistent application. Although the Legislature has not acted to disapprove the court's analysis in *Buffum* by modifying language in the several applicable statutes, neither has it expressly or impliedly endorsed it. Accordingly, it is appropriate for us to have reexamined and rejected our earlier holding. (*People* v. *Escobar, supra,* 3 Cal.4th 740, 750-751.)

C

■■■ Finally, defendant contends that any judicial reinterpretation of section 182, when considered in conjunction with sections 27, subdivision (a)(1), and 778a, subdivision (a), cannot be applied to her without violating the prohibition against ex post facto laws and the requirements of due process of law contained in the federal and state Constitutions. (U.S. Const., art. I, § 9, cl. 3; *id.,* 14th Amend.; Cal. Const., art. I, §§ 7, subd. (a), 9.) The

---

[14]When a statute is amended, the portions not modified " 'are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment. . . .' " (*People* v. *Escobar, supra,* 3 Cal.4th 740, 751, fn. 5, quoting Gov. Code, § 9605.)

prohibitions against ex post facto laws, however, apply only to legislative enactments and not to judicial decisions. (*Marks* v. *United States* (1977) 430 U.S. 188, 191 [97 S.Ct. 990, 992, 51 L.Ed.2d 260]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 586 [280 Cal.Rptr. 631, 809 P.2d 290].) Because no legislative enactment is here at issue, the constitutional ex post facto clauses do not apply.

Nonetheless, a judicial enlargement of a criminal statute that is not foreseeable, "applied retroactively, operates in the same manner as an ex post facto law. [Citation.]" (*People* v. *Davis* (1994) 7 Cal.4th 797, 811 [30 Cal.Rptr.2d 50, 872 P.2d 591]; see *People* v. *Escobar, supra,* 3 Cal.4th 740, 752.) Holding a defendant criminally liable for conduct that he or she could not reasonably anticipate would be proscribed, "violates due process because the law must give sufficient warning so that individuals 'may conduct themselves so as to avoid that which is forbidden.' [Citation.]" (*People* v. *Davis, supra,* 7 Cal.4th at p. 811; *People* v. *Cuevas* (1995) 12 Cal.4th 252, 275 [48 Cal.Rptr.2d 135, 906 P.2d 1290].) "[A] state Supreme Court, no less than a state Legislature, is barred from making conduct criminal which was innocent when it occurred, through the process of judicial interpretation. 'If a judicial construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," it must not be given retroactive effect. [Citation.]' " (*People* v. *Escobar, supra,* 3 Cal.4th at p. 752.)

In the present case, pursuant to the former *Buffum-Burt* standards, our state lacked jurisdiction to prosecute defendant for her participation in the conspiracy, because of the absence of evidence of an *attempt* to commit the object offense within this state. In view of the long-standing decision in *Buffum,* as endorsed by our decision in *Burt,* for us to construe the applicable statutes to afford jurisdiction over the conspiracy in the present case— despite the lack of an attempt to commit the object offense of the con- spiracy—would be analogous to expanding defendant's criminal liability under the conspiracy statute by eliminating a required element of that offense. In essence, our decision in *Buffum* limited our state's jurisdiction to prosecute a particular type of crime—conspiracy—to those cases in which an implicit element—an attempt to commit a distinct offense—had been completed within the state. Therefore, we review whether the present deci- sion is so "unexpected" as to preclude its retroactive application. (See *People* v. *Davis, supra,* 7 Cal.4th 797, 811; *People* v. *Escobar, supra,* 3 Cal.4th 740, 752; see also *Marks* v. *United States, supra,* 430 U.S. 188, 196 [97 S.Ct. 990, 995] [declining to apply retroactively an earlier decision that more broadly interpreted a statute defining obscene materials and thereby expanded the type of conduct deemed criminal]; *Gosa* v. *Mayden* (1973) 413 U.S. 665,

685 [93 S.Ct. 2926, 2938-2939, 37 L.Ed.2d 873] [declining to apply retro-
actively an earlier decision holding that military courts had no jurisdiction
over certain non-military-related offenses committed by servicemen].)[15]

Our prior decisions addressing this subject, although very few in number,
consistently indicated that this state's jurisdiction over a conspiracy commit-
ted within this state, the object crime of which is committed outside Cali-
fornia, is limited to the situation where an attempt to commit the underlying
crime has occurred within this state. Accordingly, it is appropriate that we
give only prospective application to our decision abandoning that require-
ment, so as to avoid increasing the punishment for defendant's offenses after
she committed them. (*People* v. *King*, *supra*, 5 Cal.4th 59, 80.)

## III

### A

 The Court of Appeal affirmed defendant's conviction of the of-
fenses of possession of cocaine for sale and transportation of cocaine,
concluding that the court was not bound by *Buffum* or *Burt* because our
earlier decisions did not discuss the applicability of the requirements for
conspiracy to the liability of a defendant based upon aiding and abetting a
crime pursuant to section 31. Defendant contends, however, that the prin-
ciples enunciated in *Buffum* require that this state may only assert jurisdic-
tion to prosecute a defendant based upon a theory of aiding and abetting
inside the state where the commission of the offense occurs outside the state,
if the acts within the state amount to an *attempt* to commit the underlying
offense within the state.[16]

As noted, we have deemed it necessary to overrule our decision in *Buffum*
insofar as it held that our state lacks jurisdiction over conspiracy unless the

---

[15]Decisions such as the present case may be contrasted with those in which, for example,
the court determines that a less stringent standard of review is appropriate to review a
particular issue. (See, e.g., *People* v. *Breverman* (1998) 19 Cal.4th 142, 178, fn. 26 [77
Cal.Rptr.2d 870, 960 P.2d 1094] [decision adopting the standard of *People* v. *Watson* (1956)
46 Cal.2d 818, 836 [299 P.2d 243], to review a claim that an instruction on a lesser included
offense erroneously was omitted may be applied retroactively]; *People* v. *Cuevas*, *supra*, 12
Cal.4th 252, 275 [adoption of the substantial evidence test as the standard for judging the
sufficiency of an out-of-court identification to support a conviction did not expand criminal
liability; conduct for which the defendant was convicted previously was criminal].) In the
latter type of case, it is appropriate to apply the court's holding retroactively.

[16]Defendant relies in part upon the decision in *People* v. *Utter*, *supra*, 24 Cal.App.3d 535,
550, which applied *Buffum*'s jurisdictional limitation on conspiracy to preclude jurisdiction
over a murder that occurred out of state, because the defendant did not commit acts within the
state amounting to an *attempt* to commit murder. To the extent *Utter* interprets the jurisdic-
tional statutes as not affording jurisdiction over offenses partially committed within the state,
absent an attempt, that decision is overruled.

conspiracy includes acts committed within the state sufficient to constitute an attempt to commit the offense that is the object of the conspiracy. Thus, it may be apparent that we do not agree that the doctrine of *Buffum* nonetheless would or should apply in the situation where the theory of liability is that of aiding and abetting the commission of the offense, thereby requiring that an attempt to commit the offense occur within the state. We shall explain the basis for our rejection of defendant's application of the rule enunciated in *Buffum*.

Defendant was prosecuted as a principal based upon her acts in aiding and abetting the commission of the offenses. Section 31 provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." That statute plainly is intended to apply criminal liability as a principal to those who are not present at the commission of an offense if, with the requisite intent, they have assisted the perpetrator. (See *People* v. *Ah Gee* (1918) 37 Cal.App. 1, 4-5 [174 P. 371].)

As we have explained, the doctrine enunciated in *People* v. *Beeman* (1984) 35 Cal.3d 547, 554-555 [199 Cal.Rptr. 60, 674 P.2d 1318], that one may be liable as an aider and abettor "when he or she aids the perpetrator of an offense, knowing of the perpetrator's unlawful purpose and intending, by his or her act of aid, to commit, encourage, or facilitate commission of the offense, 'snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime.' [Citation.]" (*People* v. *Montoya* (1994) 7 Cal.4th 1027, 1039 [31 Cal.Rptr.2d 128, 874 P.2d 903].) Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense. (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 439 [231 Cal.Rptr. 832].)[17]

In the present case, defendant clearly knew of Flores's unlawful purpose and intended, by her acts of aid, to commit, encourage, and facilitate the commission of the offenses, because she personally had contacted Flores and hired him to commit them. Defendant aided the perpetrator of the

---

[17]In *People* v. *Durham* (1969) 70 Cal.2d 171, 182, footnote 9 [74 Cal.Rptr. 262, 449 P.2d 198], involving the prosecution of an aider and abettor, we emphasized "that the resort to language of conspiracy in [aider and abettor] cases . . . does not refer to the crime of that name but only to the fact of combination as it has relevance to the question of aiding and abetting in the commission of the charged crime."

offenses by driving Flores to the airport and providing his airline tickets. Subsequently, defendant directed the actions of Flores throughout his commission of the offenses, as she herself received directions from her own superior. Her liability as a principal on an aiding and abetting theory cannot be doubted.

Defendant asserts, nonetheless, that the Attorney General and the Court of Appeal have employed the applicable doctrines of *criminal liability* (aiding and abetting, and constructive possession or transportation of controlled substances) to establish California's *criminal jurisdiction* to apply its penal sanctions to punish a defendant who participated in offenses consummated in another jurisdiction. We do not agree. Had Flores possessed for sale and transported the cocaine *within* California, these doctrines of criminal liability clearly would be applicable to the acts that defendant committed. Therefore, we need ascertain, in addition, only whether defendant's criminal liability for those acts may be made the subject of California's criminal sanctions based upon our principles defining the jurisdiction of our courts when the acts are completed outside this state.

As explained above, section 27, subdivision (a)(1), affords our courts jurisdiction over crimes partially committed within this state, and section 778a, subdivision (a), affords our courts jurisdiction over crimes committed outside the state if the defendant formed the intent and committed "any act" within this state in whole or partial execution of that intent. The preparatory acts that included defendant's hiring and instruction of Flores, her assistance in transporting him to the agreed-upon location to receive the cocaine, and her instruction on, and use of, a method of communication designed to avoid detection by law enforcement agencies, clearly establish that defendant initiated the offenses from inside this state. Similarly, defendant's ongoing assistance in the form of communications and directions given Flores during the course of several transfers of cocaine in several states, clearly establishes that defendant from inside this state assisted in the completion of the offenses out of state, despite defendant's lack of direct personal contact with the controlled substances. Accordingly, defendant's conduct within the state was criminal and the state had jurisdiction afforded by statute to punish her conduct.

Defendant urges that we follow the reasoning and policy concerns expressed in a New York decision (*People* v. *Werblow* (1925) 241 N.Y. 55 [148 N.E. 786] (*Werblow*)) relied upon by this court in *Buffum*. Defendant contends that *Werblow* establishes that the identical threshold requirement (that of an in-state attempt) does or should apply when the crime is committed outside the jurisdiction if liability for committing the substantive offense

is premised upon an aiding and abetting theory (as in the present case). We do not agree.

At the time that decision was rendered, New York's Penal Law, section 1930, subdivision 1, subjected to punishment within that state " 'a person who commits within the state any crime, in whole or in part.' " (*Werblow, supra*, 241 N.Y. 55, 60 [148 N.E. 786, 788].) No specific statute supplied jurisdiction for incitement within New York of an offense that actually was committed elsewhere. (*Id.* at p. 63 [148 N.E. at p. 790].)

In that case, the three "brothers Werblow" were convicted of grand larceny (but were *not* charged or convicted of conspiracy) in New York, based upon the circumstances that within that state, they entered into an agreement to commit fraudulent bank transactions in England and China, and thereafter one brother traveled to China and from that country sent to another brother (who had traveled to England) certain fraudulent documents enabling him to obtain money from a bank in England (the branch bank of a New York bank). In construing the New York statutes defining jurisdiction to require reversal of the convictions, Judge Cardozo reasoned that an actor who merely hires an agent in one jurisdiction to commit an offense in another jurisdiction has not yet acted in a manner that is punishable in the first jurisdiction, because the agent subsequently may abandon or renounce the plan to commit the offense. (*Werblow, supra*, 241 N.Y. 55, 65 [148 N.E. 786, 790-791].) Accordingly, the court in *Werblow* concluded, the actor must do something further within the first jurisdiction, that is, *attempt* to commit the offense in that jurisdiction, before the actor may be found liable. (*Id.* at pp. 60-66 [148 N.E. at pp. 788-791]; see Rotenberg, *Extraterritorial Legislative Jurisdiction and the State Criminal Law, supra*, 38 Tex. L.Rev. at p. 778 [suggesting that Judge Cardozo used the "vertical" of criminal liability to decide the "horizontal" of jurisdiction].)

Commenting upon the absence of any statute conferring jurisdiction for inciting an offense committed elsewhere, Judge Cardozo also concluded that the activities of the brother who remained in New York in sending the others messages were insufficient to find jurisdiction over the grand larceny alleged to have been committed in New York. "What was done in New York by the exchange of cablegrams or messages wherewith to inform the confederates of their parts in the drama of this crime was merely confirmation of the plot and encouragement to execute it. The line was not crossed that divides execution, partial or complete, from incitement and conspiracy." (*Werblow, supra*, 241 N.Y. 55, 66-67 [148 N.E. 786, 791].)

In view of our different jurisdictional statutes, the reasoning of *Werblow* is not compelling and factually the case is distinguishable. In *Werblow*, within

the jurisdiction of New York, the defendants merely *agreed,* and the brother remaining there merely acted to *incite* the others, to complete the offense— conduct not an element of the offense of larceny and therefore not establishing even partial commission of that offense within the state, nor otherwise falling within the statutes conferring jurisdiction. (241 N.Y. 55, 62-63, 65-66 [148 N.E. 786, 789-790, 790-791].)

Our jurisdictional statutes afford jurisdiction not merely over crimes partially committed within this state (§ 27, subd. (a)(1)) but also over crimes committed outside the state if the defendant formed the intent and committed "any act" within this state in whole or partial execution of that intent. (§ 778a, subd. (a).) Notwithstanding our suggestion to the contrary in *Buffum, supra,* 40 Cal.2d 709, 716-717, the latter cited statute is by its terms broader in scope than the former, and confers jurisdiction over a wider range of conduct than those statutes considered in *Werblow,* even should we continue to construe the former statute in a manner consistent with the similar statute in *Werblow.*

In addition, we recognize that there is a more general theoretical concern expressed in *Werblow* and echoed in *Buffum*—that if we do not construe such statutes to require, at minimum, an in-state attempt, there is no valid basis to distinguish a case in which a defendant's in-state conduct renders our jurisdiction appropriate from one in which a defendant's conduct in state, even if intended to achieve a criminal goal elsewhere, is so de minimis that our state nonetheless may not assert its jurisdiction over the committed offense. That general theoretical concern, however, does not reflect the realities of the present case. Defendant solicited, hired, and instructed Flores in California, as well as transporting him to the point of departure and paying for his flight from the state. Although at that point, neither the acts of defendant nor those of Flores constituted an attempt to possess for sale or transport cocaine within this state, we determine that these preparatory acts (coupled with the requisite intent) clearly constituted more than de minimis acts toward the eventual completion of the offenses, and considered together with the completion of the offenses elsewhere, afforded our state jurisdiction to punish defendant. Jurisdiction having been established, defendant's continued assistance, while remaining in California, during each phase of several drug transactions conducted in several states, resulted in her liability for those completed offenses.

Defendant urges that application of the *Buffum* rule to offenses in which liability is premised upon aiding and abetting, would not result in her escaping punishment. Defendant points out that she would remain subject to punishment under federal drug trafficking laws (of which Flores was found guilty), or the laws of one of the states involved, such as Louisiana.

The circumstance that these jurisdictions had authority to prosecute and punish defendant does not mean they *would* do so. Federal law enforcement agencies, presented with such a potential prosecution, might waive their authority in favor of concentrating their finite resources upon prosecuting those individuals within the drug trafficking organization who are more highly placed, or whose activities concern the territorial jurisdiction of the United States. In addition, although federal criminal statutes apply to the offenses that are the subject of the present case, in general criminal law enforcement remains an area in which the states historically have been sovereign. (*United States* v. *Lopez* (1995) 514 U.S. 549 [115 S.Ct. 1624, 131 L.Ed.2d 626].) It is not difficult to conceive of instances in which a defendant within one state may aid and abet an offense completed within another state, implicating only state criminal law.

Similarly, the law enforcement agencies of other states for a number of reasons might decline to prosecute a defendant in such a situation. For example, in the present case the State of Louisiana might be reluctant to prosecute defendant not only due to the possible jurisdictional challenge she might be able to raise in light of her limited contacts with that state, but also due to the obvious practical difficulties that would arise in haling defendant into court in that distant forum. Moreover, another state itself may have jurisdictional standards that limit its authority to prosecute a defendant, on a theory of aiding and abetting, to those offenses consummated inside the state.

Nothing in the circumstance that another sovereign *might* act to prosecute defendant for her participation in the present offenses compels us to conclude that California lacks jurisdiction to prosecute her for these offenses. In light of the legislative protections granted criminal defendants in the statutes precluding multiple prosecutions or convictions, it is quite apparent that our state is empowered to prosecute individuals within the state who participate in such criminal enterprises when the offenses are initiated partially within our borders and prosecution is consistent with existing constitutional and legislative constraints.

### B

Finally, we must decide whether our determination that this state has jurisdiction to prosecute defendant for the substantive offenses of possessing cocaine for sale and transporting cocaine based upon the acts of assistance she performed within this state (despite the circumstance that the offenses were not attempted within this state) is consistent with our then

existing interpretation of California's jurisdiction to prosecute offenses other than conspiracy. As we have seen, *Buffum's* holding itself was rendered in the context of the crime of conspiracy. (*Buffum, supra,* 40 Cal.2d 709, 715-718.) In *Burt,* we declined to extend *Buffum's* requirement to a similar crime, that of solicitation, while indicating that the requirement was restricted to conspiracy. (*Burt, supra,* 45 Cal.2d 311, 313-315.) Thereafter, in *Anderson,* we merely noted that the evidence of initial in-state misrepresentations was sufficient in that case to find an attempt within the state to commit larceny by fraud, trick, or device, while emphasizing that the assertion of our jurisdiction was supported by the additional factors that the victims and their property originally were present in California. (*Anderson, supra,* 55 Cal.2d 655, 661-662.) Thus, it does not appear that this court previously had announced, or applied consistently, a rule that an attempt to commit the underlying offense must occur within this state regardless of the type of underlying offense, and regardless of the theory of liability. (*People v. Davis, supra,* 7 Cal.4th 797, 812; *People v. King, supra,* 5 Cal.4th 59, 80.) Although some Courts of Appeal have read *Buffum* expansively (see, e.g., *People v. Utter, supra,* 24 Cal.App.3d 535, 550), that tendency has not been universal. (See *People v. Monteverde, supra,* 236 Cal.App.2d 630, 637-638.)

Moreover, unlike the many cases in which an assertion of jurisdiction might be unexpected because the defendant, originally having been within this state, travels to another jurisdiction to commit the great majority of the acts related to the offense, in the present case defendant's ongoing direct involvement and assistance following her initial conduct, all from her location within California, involved acts that she reasonably could anticipate would be proscribed under California law. (See *Anderson, supra,* 55 Cal.2d 655, 662.) Therefore, our determination on this issue may be applied to defendant, unlike the new interpretation of our jurisdiction over the offense of conspiracy that we have enunciated above.

## IV

We affirm the judgment of the Court of Appeal reversing defendant's conviction of conspiracy to transport and possess cocaine for sale, based upon our conclusion that defendant's agreement and the overt acts she performed inside the state did not, as required by the law then applicable, amount to an attempt to commit the offenses. We also affirm the judgment of that court upholding defendant's conviction for transporting and

possessing cocaine for sale, based upon her having aided and abetted the commission of these offenses.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied July 21, 1999.