Filed 6/27/13  P. v. Agaton-Hernandez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO AGATON-HERNANDEZ,<br><br>    Defendant and Appellant. | H037855<br>(Monterey County<br>Super. Ct. No. SS082497A) |

Following a bench trial, the trial court found defendant Francisco Agaton-Hernandez guilty of second degree murder for the killing of Roshni Singh.  The court sentenced him to a term of 15 years to life.  On appeal, defendant contends the evidence was insufficient to support a conviction of second degree murder.  We find the evidence sufficient to support the conviction, and we will affirm the judgment.[1]

FACTS

Victor Cabrera was defendant's former boss and the coconspirator in the murder. On September 28, 2008, Cabrera strangled to death his girlfriend, Roshni Singh, sometime between midnight and 2:00 a.m. at their home in Marina.  Defendant was working at a donut shop in Seaside at the time, but he joined Cabrera later that morning. Defendant admitted he helped Cabrera cover up the murder by staging a robbery, moving

---

[1] Defendant also has filed a petition for writ of habeas corpus, which we have ordered considered with the appeal.  We have disposed of the petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

the body, and disposing of evidence. Defendant denied he was involved in planning to kill Singh. He claimed he was unaware of the murder until after Cabrera had killed Singh. However, a witness, Jose Ayuzo, told police that defendant offered to pay him $30,000 to tie up a woman and batter her. Several hours before Singh was killed, defendant told Ayuzo to go to a gas station in Monterey to commit the assault, but Ayuzo did not go. Cabrera killed Singh later that night.

I.     *Cabrera's Fabricated Coverup Story to Police*

Victor Cabrera worked at the Village Motor Works Gas Station on North Fremont Street in Monterey. On September 28, 2008, the day of the murder, at around 6:30 a.m., Cabrera called 911 from the gas station. When police arrived, they found Cabrera on the floor, with his hands tied behind his back. Candy boxes and other items were scattered on the floor. Cabrera claimed he had been robbed. He said he had struggled to free himself for approximately 45 minutes, until he was able to knock over a phone with his nose and dial 911 with his tongue.

Cabrera told police the following false story: He and Singh had driven to the gas station at about 5:00 a.m. in a red Toyota 4Runner. They were planning to go shopping in Berkeley, but he had left his wallet, jacket, and cell phone charger at the gas station the night before. They went to the gas station to retrieve the items before going to Berkeley. Singh remained in the car while he went into the shop. After he went into the shop, two dark-skinned males entered the shop and robbed him. One had a knife, and the other had a handgun. They took his wallet and cell phone, tied him up, and struck him several times. He did not know what happened to Singh or the 4Runner during the robbery. He noticed that the 4Runner was missing when he was calling 911.

Cabrera gave police permission to search his home in Marina, where they found Singh's wallet and cell phone. Later that day, police found the 4Runner parked at an apartment complex in Monterey. Singh's body was lying face down in the back seat.

2

Cabrera was the beneficiary of a $600,000 life insurance policy on Singh. A second policy for $360,000 named Singh's son as a beneficiary. Cabrera had planned to take care of Singh's son in the event of her death.

Cabrera disappeared before police could arrest him. At the time of defendant's trial, Cabrera was still missing.

II.     *Defendant's Involvement in the Murder*

Police found defendant through a search of Cabrera's phone records. The records showed calls to and from a phone belonging to "Martin Cerda," an alias used by defendant. Cabrera had previously been a manager at a Burger King. He had helped defendant obtain a job at the Burger King by supplying him with a social security number and the Martin Cerda alias.

Defendant made numerous inconsistent statements in multiple interviews with the police. After lying about many aspects of his involvement in the crime, defendant eventually admitted to the following: Cabrera had visited him at work at Red's Donuts in Seaside on September 27, 2008, the night before the murder, around 10:00 p.m. to 11:00 p.m. Cabrera wanted defendant to come to Cabrera's home in Marina, but defendant said he did not get off work until 4:00 a.m. or 5:00 a.m. They then spoke on the phone shortly after 4:00 a.m., when Cabrera again invited defendant to his home in Marina. Defendant initially claimed he did not know why Cabrera wanted him to go to Marina. Defendant later said Cabrera wanted him to clean the house.

At around 4:30 a.m., defendant left Red's Donuts, went home, and changed his clothes. He was due at his second job at Burger King at 6:30 a.m. Nevertheless, he took a taxi from his home to Cabrera's home in Marina at around 5:00 a.m. Police interviewed the taxi driver, who confirmed that he drove defendant to Marina around that time. The driver noticed that defendant was wearing plastic gloves. Defendant told the driver to drop him off on a corner several houses away from Cabrera's house. Defendant also told the driver he would need another ride later.

When defendant got to Cabrera's house, Singh was already dead. Defendant claimed Cabrera did not tell him about the murder until defendant arrived, and that Cabrera had everything planned. Defendant insisted he would not have gone to Cabrera's house if he had known Cabrera had killed Singh.

Defendant said Cabrera invited him in and asked him to help move the body into the car. Singh's body was on a sofa in the living room. Defendant helped Cabrera move the body to the car. Defendant opened the car door, and Cabrera pushed the body into the car. Defendant also turned over the couch cushions that were underneath the body.

Cabrera and defendant then took the body to the gas station to stage the robbery. At the gas station, Cabrera gave defendant a rope. Cabrera told defendant to tie him up, hit him, and throw around some candy and cigarettes. Defendant tied Cabrera, hit him twice, and threw some candy bars on the floor. Defendant then took Cabrera's cell phone and wallet, and threw them in the rear parking lot.

After staging the robbery, defendant drove the 4Runner with Singh's body in the back to an apartment complex in Monterey, where he parked the car with the body. He threw the car keys into the bushes, and called the taxi driver to pick him up. Police later located the keys where defendant said they were.

Defendant said he helped Cabrera because Cabrera had treated him well and had helped him get a social security number and a job. Defendant said Cabrera was planning to buy the gas station, and had promised defendant a job there. Defendant denied that he asked Cabrera for money, but he said Cabrera had promised to give him money after the crime was completed. Cabrera did not say how much money he would give defendant.

III.     *Jose Ayuzo's Involvement*

Police also found Jose Ayuzo after discovering numerous phone calls between defendant and Ayuzo in the days before the murder. When police interviewed Ayuzo, he initially denied any involvement, but he later admitted defendant had solicited his help. Ayuzo made multiple different statements, mixed up the timing of events, and gave

4

vague answers to specific questions. At trial, the parties stipulated that Ayuzo, if called to testify, would give testimony consistent with the following:

One week before the murder, defendant offered Ayuzo $30,000 to help him tie up and batter a woman at a tire shop in Monterey. The money belonged to the woman's boyfriend, who was defendant's friend. After this conversation, however, Ayuzo was arrested for shoplifting and decided not to help defendant with the crime. But because Ayuzo feared defendant, he kept telling defendant he would help with the assault.

Ayuzo met with defendant again several days before the murder. Defendant told Ayuzo to meet him at a tire shop and gas station on North Fremont Street in Monterey at 5:00 p.m. on September 27, 2008. The plan was for the woman to arrive there with her boyfriend, whereupon defendant and Ayuzo would beat her and tie her up.

On the afternoon of September 27, defendant saw Ayuzo on the street, and offered him a ride. Defendant told Ayuzo to be at the gas station at 5:00 p.m. Ayuzo later said the time was between 5:00 p.m. and 7:00 p.m. Ayuzo turned off his cell phone during part of the evening, and did not go to the tire shop. Later that evening, he turned his phone on and called defendant, who was angry with Ayuzo. Ayuzo said multiple times that he did not hurt Singh or move her body.

Phone records show defendant and Ayuzo called each other more than two dozen times between September 17 and September 26, 2008. On September 27, defendant called Ayuzo more than thirty times. On September 28, defendant called Ayuzo nine times. After 6:45 p.m. on September 27, all defendant's calls went to Ayuzo's voice mail. Ayuzo's phone service was canceled on September 28.

THE TRIAL COURT'S VERDICT

The trial court found defendant guilty of second degree murder. The court credited Ayuzo's statement, and found that defendant recruited Ayuzo for the purpose of harming Singh. The court identified money as the only motive for the crime, and noted that the motive could only be accomplished by killing Singh. The court rejected

5

defendant's claim that he helped Cabrera cover up the murder because Cabrera had treated him well. The court also found circumstantial evidence showing defendant knew of the murder before arriving at Cabrera's house on the morning of September 28.

DISCUSSION

Defendant contends the evidence is insufficient to show that he conspired to murder Singh. He argues that the evidence shows two separate conspiracies: First, he conspired to beat and tie up Singh on September 27; second, he conspired to cover up the murder. Defendant contends there is no substantial evidence that he agreed or intended to agree to murder Singh. He further argues that Singh's death was not a natural and probable consequence of the conspiracy to assault her. Under defendant's theory, he is guilty as an accessory after the fact, not as a coconspirator in Singh's murder.

We find sufficient evidence supporting the trial court's verdict, and we will affirm the judgment.

I.      *Standard of Review*

In reviewing a claim of insufficient evidence, this court reviews the whole record in the light most favorable to the prosecution to determine whether the record discloses substantial evidence to support the conviction. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496; *People v. Combs* (2004) 34 Cal.4th 821, 849.) "Substantial evidence" is evidence that is "reasonable, credible, and of solid value" such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 34, 314.)

"[A] conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) The agreement may be shown by circumstantial evidence, and the defendant's conduct carrying out their mutual purpose is sufficient. (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575.) "[I]t need not be shown that the parties met and actually agreed to jointly undertake criminal action. On the contrary, a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design." (*People v. Brown* (1969) 272 Cal.App.2d 623, 628.)

II.  *Sufficiency of the Evidence*

Defendant's contention that he believed they were simply planning to assault Singh defies logic. The conspirators would have no motive for the crime unless they killed Singh for the life insurance benefits. In his numerous statements to police, defendant never offered any explanation for why they would want to assault Singh, but not kill her. Nor does defendant explain why, in the absence of some greater financial motive, they would offer to pay $30,000 to a third party to assist them. Echoing his statements to police, defendant claims he was motivated to help Cabrera cover up the murder because Cabrera had helped him obtain a job and social security number.

Defendant denied knowing of the murder before it happened. But the evidence supports the inference that defendant knew of the murder before arriving at Cabrera's home. The taxi driver testified that defendant was wearing plastic gloves on the way to Cabrera's home, suggesting defendant knew he would be involved in cleaning up a crime scene. Defendant claims it is "thoroughly unremarkable" that he was wearing gloves because he had just gotten off work at the donut shop. This ignores defendant's own

7

statement that he went home and changed clothes before taking the taxi to Cabrera's house. The taxi driver also testified that defendant asked to be dropped off on a street corner several houses from Cabrera's home, suggesting defendant did not want to be associated with the crime scene. Defendant argues alternately that Cabrera may have told him of the murder for the first time when they spoke on the phone at 4:00 a.m., before defendant left Red's Donuts. The record holds no evidence to support this speculation.

Defendant's numerous false statements to the police also cast doubt on his claims. He initially denied knowing anything about the murder. He denied going to Cabrera's house or the gas station. In subsequent interviews, he admitted some elements of his involvement, but continued to lie about the extent of it. He claimed he had gone from work directly to the gas station to fake the robbery, and he denied moving the 4Runner. When confronted with the taxi driver's statements, he admitted going to Cabrera's house, but he claimed Singh's body was already in the car when he arrived. Defendant's continued false statements and omissions suggest he also lied about his lack of involvement in planning the murder.

Defendant questions the credibility of Ayuzo's statement to police. But the phone records showing dozens of calls between defendant and Ayuzo corroborate Ayuzo's statement. Defendant continued calling Ayuzo even after Ayuzo had turned off his phone and failed to appear at the gas station. Defendant notes that the police report describes Ayuzo as giving "multiple different statements." However, trial counsel chose to forgo cross-examination of Ayuzo by stipulating to the admission of Ayuzo's statements as set forth in the police report.

Relying on *People v. Herrera* (2006) 136 Cal.App.4th 1191 (*Herrera*), defendant contends we should reject the prosecution's use of "the absence of evidence to support an affirmative inference of appellant's guilt." In *Herrera*, the court affirmed the dismissal of a charge of conspiracy to manufacture methamphetamine. Police caught Herrera with a large quantity of pseudoephedrine pills. (*Id.* at pp. 1195-1196.) He told police he

8

planned to sell them to someone that he knew would use them to manufacture methamphetamine. Apart from Herrera's statement, there was no evidence of a co-conspirator. Herrera invoked the rule of corpus delicti and successfully moved under Penal Code section 995 to dismiss the charge. (*Id.* at p. 1196.)

On appeal, the prosecution argued that the absence of a methamphetamine laboratory in Herrera's home supported the inference that Herrera was the middleman in a conspiracy. (*Herrera, supra,* at pp. 1204-1205.) The court rejected this argument, citing the proposition that "[a] legal inference cannot flow from the nonexistence of a fact; it can be drawn only from a fact actually established." (*Id.* at p. 1205, quoting *People v. Stein* (1979) 94 Cal.App.3d 235, 239.)

Agaton-Hernandez contends this proposition requires reversal here because there was no evidence he conspired to kill Singh. But *Herrera* is inapposite. The trial court did not rely on an "absence of evidence" to show defendant's participation in the murder conspiracy. The record provides sufficient evidence of participation in the murder scheme given the financial motive, Ayuzo's statements about a $30,000 payoff, the numerous phone calls with Ayuzo, and defendant's conduct in the taxi en route to the actual murder scene. The prosecution was not required to show direct proof of an explicit agreement between the conspirators. (*People v. Brown*, *supra*, 272 Cal.App.2d at p. 628.) An agreement may be shown by circumstantial evidence and the defendant's conduct carrying out their mutual purpose. (*People v. Lipinski*, *supra*, 65 Cal.App.3d at p. 575.) The circumstantial evidence and defendant's conduct here are sufficient to prove he entered into an agreement, either tacit or explicit, to murder Singh.

9

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.

10